NOTE: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

───────────────

**XPERTUNIVERSE INC.,**
*Plaintiff-Appellant,*

**v.**

**CISCO SYSTEMS, INC.,**
*Defendant-Appellee.*

───────────────

2014-1281

───────────────

Appeal from the United States District Court for the District of Delaware in No. 1:09-cv-00157-RGA, Judge Richard G. Andrews.

───────────────

Decided: January 21, 2015

───────────────

DONALD R. DUNNER, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief was ALLEN M. SOKAL.

KATHLEEN M. SULLIVAN, Quinn Emanuel Urquhart & Sullivan, LLP, of New York, New York, argued for defendant-appellee. With her on the brief were CLELAND B. WELTON, II; and DANIEL H. BROMBERG, of Redwood Shores, California. Of counsel on the brief were BRETT M.

SCHUMAN, Morgan, Lewis, & Bockius LLP, of San Francisco, California, and KELL M. DAMSGAARD, of Philadelphia, Pennsylvania.

————————————

Before PROST, *Chief Judge,* MAYER, and LOURIE, *Circuit Judges.*

PER CURIAM.

XpertUniverse Inc. ("XpertUniverse") appeals a final judgment of the United States District Court for the District of Delaware granting judgment as a matter of law ("JMOL") on its claim for fraudulent concealment, *see XpertUniverse Inc. v. Cisco Sys., Inc.*, No. 1:09-cv-00157, 2013 WL 6118447 (D. Del. Nov. 20, 2013) ("*JMOL Decision*"), and summary judgment on its claims for breach of contract and trade secret misappropriation, *see XpertUniverse Inc. v. Cisco Sys., Inc.*, No. 1:09-cv-00157, 2013 WL 867640 (D. Del. Mar. 8, 2013) ("*Summary Judgment Decision*"). We affirm.

BACKGROUND

XpertUniverse developed expert-location software for corporate call centers. J.A. 1083–84. It asserts that its technology "broke down the walls of traditional call centers—where a fixed group of individuals with a fixed set of skills waited for calls—and allowed organizations to capitalize and share the knowledge of their employees, regardless of their role or location." J.A. 6034. In the spring of 2004, XpertUniverse demonstrated its product at the annual "G Force" conference hosted by Genesys Telecommunications Laboratories, Inc. ("Genesys"). J.A. 1085. According to XpertUniverse, Genesys was "very, very impressed" with its product, J.A. 1086, and the two "companies were rapidly forming a mutually beneficial business partnership and were prepared to quickly go to market because [Genesys'] router was already integrated with [XpertUniverse's] technology." Br. of Plaintiff-

Appellant at 15; *see also* J.A. 1087. In the summer of 2004, however, Laurent Philonenko, Genesys' chief executive officer, left Genesys and became general manager of the Customer Contact Business Unit ("CCBU") at Cisco Systems, Inc. ("Cisco"). Soon thereafter, XpertUniverse began working with Cisco to integrate its technology into Cisco's routers. J.A. 1086–87.

In August 2004, XpertUniverse and Cisco executed a non-disclosure agreement, J.A. 1087–88, and by April 2005, XpertUniverse had been admitted to Cisco's Technology Developer Partner ("TDP") program, J.A. 1073. Participants in the TDP program pay a small fee that entitles them to assistance from Cisco engineers in integrating their technology with Cisco products. J.A. 1613–14. In December 2005, John Hernandez, the director of product management at the CCBU, invited XpertUniverse to apply for Cisco's SolutionsPlus program. J.A. 1191. Admission to the SolutionsPlus program was very important to XpertUniverse because it would allow Cisco's "army of salespeople" to sell XpertUniverse's product at full commission. J.A. 1190; *see also* J.A. 1335, 1337. Admission to the program would also allow XpertUniverse's "product to be listed in Cisco's catalog as a Cisco approved product." J.A. 1190.

Cisco informed XpertUniverse that admission to the SolutionsPlus program was "VERY selective." J.A. 5129. Furthermore, even if the SolutionsPlus Governance Council (the "Governance Council" or "Council") approved a product, it still had to undergo a 90-day test period, after which Cisco could decide "in its sole discretion" whether to keep the product in the SolutionsPlus program for a two-year period. J.A. 5151.

Working with Elizabeth Eiss, XpertUniverse's president, Balaji Sundara, a Cisco product manager, prepared XpertUniverse's SolutionsPlus application. J.A. 1343. In April 2006, Sundara presented XpertUniverse's applica-

tion to the Governance Council.  J.A. 1343–44.  The Council, however, voted to deny the application, concluding that XpertUniverse's platform appeared to be a "niche product" which was not likely to result in "horizontal revenue pull through."  J.A. 10948.  The Governance Council was also concerned that Cisco's sales force would have difficulty selling XpertUniverse's technology.  J.A. 11132; *see also* J.A. 1215.

Hernandez testified at trial that the "vast majority of companies" underwent "multiple reviews" by the Governance Council, and that he had been confident that the Council's concerns about XpertUniverse's technology could eventually be overcome.  J.A. 1621; *see also* J.A. 1631.  In order to allay the Council's fear that XpertUniverse's technology would not generate significant revenue for Cisco, Hernandez knew that he needed to secure a "lighthouse account," or lead customer, for XpertUniverse's product.  J.A. 1631.  CitiGroup Inc. ("CitiGroup"), which in May 2006 was close to beginning a joint pilot project with XpertUniverse and Cisco, J.A. 1350, 5085–86, could potentially provide such a lighthouse account, J.A. 1631.  Likewise, XpertUniverse's platform could potentially be used to supply "competency based routing" for FedEx Corporation ("FedEx"), a major Cisco client.  J.A. 11065–68.  Hernandez instructed Cisco's CitiGroup team to put together a "business case" for admitting XpertUniverse to the SolutionsPlus program to take back to the Governance Council.  J.A. 1631; *see also* J.A. 5085.

Hernandez also asked Eiss for assistance in responding to the Governance Council's concern that Cisco's sales staff would have difficulty selling XpertUniverse's product.  J.A. 11148–51.  For two months, Hernandez and Eiss worked together to develop a presentation showing that Cisco's own sales staff, as well as its "channel" partners,

could effectively market XpertUniverse's technology.[1] J.A. 11077; *see also* J.A. 11097, 11102–03.

In the fall of 2006, Hernandez approached Carl Wiese, an influential member of the Governance Council. J.A. 11100; *see also* J.A. 1657 (explaining that Wiese was the "lead influencer" on the Council). Hernandez explained to Wiese that both CitiGroup and FedEx could become lead customers for XpertUniverse's technology, J.A. 11100; *see also* J.A. 1639–40.[2] He emphasized, moreover, that making XpertUniverse a SolutionsPlus partner could provide Cisco with significant revenue opportunities, both in the short and the long term. J.A. 1631–32, 1638–42, 11100. On October 6, 2006, Wiese emailed Hernandez, agreeing to support XpertUniverse's admission to the SolutionsPlus program. J.A. 11100.

---

[1]  At trial, Eiss testified that she was unaware until January 2007 that the Governance Council had voted to deny XpertUniverse's SolutionsPlus application. J.A. 1216. Eiss conceded, however, that she had been aware that the Council had considered XpertUniverse's application, but had not yet approved it. J.A. 1216 ("I knew, of course, that we didn't have an approval."). Eiss further acknowledged that she had been informed that the Council had expressed "valid concerns" about the ability of Cisco's sales staff to market XpertUniverse's product effectively. J.A. 1215.

[2]  Hernandez also suggested that XpertUniverse's product could be sold to International Business Machines Corporation ("IBM"). J.A. 11100. In early 2006, IBM expressed interest in XpertUniverse's technology, J.A. 1094, and considered offering it $20 million for a "standstill" agreement which would have precluded XpertUniverse's sale for a year, J.A. 1095. IBM, however, ultimately declined to make XpertUniverse an offer. J.A. 1105.

By December 2006, however, it became clear that Hernandez would be unable to secure a lead customer for XpertUniverse's product. J.A. 1642. The FedEx project never materialized and the pilot project with CitiGroup "fell apart," J.A. 1642, due to serious internal problems at CitiGroup, J.A. 1106; *see also* J.A. 1100–01. In January 2007, Hernandez called Victor Friedman, XpertUniverse's founder, and informed him that he had "exhausted all possibilities," J.A. 1643, and that it was "the end of the opportunity" for XpertUniverse to be admitted to the SolutionsPlus program, J.A. 1642. Hernandez stated, however, that Cisco still wanted XpertUniverse to partici-pate in the TDP program, which would allow Cisco and XpertUniverse to "validate interoperability between [their] two solutions and jointly sell side by side in the market place." J.A. 10953.

Cisco introduced its own expert location products in September 2008. J.A. 10199–200. Soon thereafter, XpertUniverse filed suit, asserting claims against Cisco for patent infringement, fraud, breach of the parties' nondisclosure agreement, and trade secret misappropria-tion. J.A. 10005–06, 10016–25, 10083–91, 10096–106. After discovery was complete, the district court granted Cisco's motion for partial summary judgment on Xpert-Universe's claims for trade secret misappropriation and breach of the parties' non-disclosure agreement. *Sum-mary Judgment Decision*, 2013 WL 867640, at *3–6. The court concluded that XpertUniverse had failed to identify all but two of its forty-six purported trade-secrets with sufficient particularity, and that there was no evidence that Cisco used the remaining two trade secrets in any of its products. *Id.* at *4. The court determined, moreover, that XpertUniverse failed to raise any genuine issue of material fact on the question of whether Cisco breached the parties' August 2004 non-disclosure agreement by incorporating information from XpertUniverse's confiden-tial documents in its products. *Id.* at *5–6.

The district court likewise granted summary judgment against XpertUniverse on all but one of its fraud claims. The court concluded that XpertUniverse had raised genuine issues of material fact only on the question of whether Cisco fraudulently concealed XpertUniverse's "status" in the SolutionsPlus program. *Id.* at *7.

Following a six-day trial, a jury found that Cisco's Expert Advisor and Remote Expert products infringed XpertUniverse's U.S. Patent Nos. 7,366,709 and 7,499,903. J.A. 45–47. The jury awarded a total of $34,383 in infringement damages. J.A. 45–47. The jury also found that Cisco committed "fraud by concealment," and that XpertUniverse sustained damages of $70 million as a result of this fraud.[3] J.A. 45.

On November 20, 2013, the district court granted Cisco's motion for JMOL on the jury's fraudulent concealment verdict.[4] *JMOL Decision*, 2013 WL 6118447, at *3–6. According to the court, XpertUniverse failed to show that Cisco's nine-month delay in informing it about the Governance Council's April 2006 vote was a material nondisclosure. *Id.* at *3–4. There was no evidence, moreover, that XpertUniverse went out of business or lost its purported $70 million in market value[5] because it learned of

---

[3]    The trial court declined to instruct the jury on punitive damages, ruling that Hernandez was not a Cisco officer, director, or managing agent. J.A. 1688–89, 1752–53.

[4]    The district court denied Cisco's motion for JMOL on the jury's patent infringement award. *JMOL Decision*, 2013 WL 6118447, at *6. On appeal, neither party challenges the jury's infringement determination or the amount of infringement damages awarded.

[5]    The jury based its damages award on testimony from Walter Bratic, XpertUniverse's expert, who opined that XpertUniverse had a value of "at least $70 million"

the Council's vote in January 2007 rather than April 2006. *Id.* at *4–5. In the court's view, there was "no substantial evidence from which the jury could have found that concealment of the 'denial' for nine months caused [XpertUniverse] to forego, or lose, other valuable partnerships, and thereby lose its entire value." *Id.* at *5.

XpertUniverse then filed a timely appeal with this court. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

DISCUSSION

A. Standard of Review

"We review grants of summary judgment and post-verdict JMOL on state law claims under the law of the regional circuit, since they present procedural issues not unique to patent law." *Shum v. Intel Corp.*, 633 F.3d 1067, 1076 (Fed. Cir. 2010); *see also Koninklijke Philips Elects. N.V. v. Cardiac Sci. Operating Co.*, 590 F.3d 1326, 1332 (Fed. Cir. 2010). In the Third Circuit, a district court's rulings on motions for JMOL are subject to de novo review. *W.V. Realty, Inc. v. N. Ins. Co.*, 334 F.3d 306, 311 (3d Cir. 2003); *Warren v. Reading Sch. Dist.*, 278 F.3d 163, 168 (3d Cir. 2002). A grant of JMOL "is appropriate only where, viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability." *Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 568 (3d Cir. 2002) (citations and internal quotation marks omitted); *see also Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1342 (Fed. Cir. 2008).

---

before the Governance Council's April 2006 vote to deny its SolutionsPlus application, J.A. 1450, but that it had lost all value by January 2007 when Cisco disclosed the denial, J.A. 1467–68, 1473–74.

We exercise plenary review over a trial court's grant of summary judgment, applying the same standard applied by the district court. *See Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007). Summary judgment is appropriate when there are no genuine issues of material fact and when, drawing all factual inferences in favor of the nonmoving party, no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011).

B. Fraudulent Concealment

"[T]he elements of a cause of action for fraud based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Bank of Am. Corp. v. Superior Ct.*, 198 Cal. App. 4th 862, 870 (2011) (citations and internal quotation marks omitted).[6] Thus, to stake out a claim for fraudulent concealment, XpertUniverse needed to show not only that Cisco intentionally concealed a material fact, but that there was a causal nexus between the concealment and any damages it sustained. *Id.*; *see also Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 609 (2014) (rejecting a claim for fraudulent concealment where the damages incurred by the plaintiff were caused

---

[6] The parties do not dispute that the law of the State of California governs XpertUniverse's fraudulent concealment claim. *See JMOL Decision*, 2013 WL 6118447, at *2.

by "a decline in the overall market" rather than the defendant's omissions).

XpertUniverse's fraudulent concealment claim fails as a matter of law because there was no credible evidence that it went out of business and lost all market value as a result of Cisco's nine-month delay in revealing that the Governance Council had voted to deny its SolutionsPlus application. While admission to the SolutionsPlus program would have enhanced XpertUniverse's ability to sell its product, J.A. 1190, 1335, there was no showing that the delay in learning of the Council's vote caused it to forego opportunities to enter into partnerships with companies other than Cisco or to lose the financial support of its investors. To the contrary, as the district court correctly determined, "the effects of finding out about the 'denial' in January 2007 were [not] any different, or any more detrimental to [XpertUniverse], than finding out about the 'denial' in April, 2006." *JMOL Decision*, 2013 WL 6118447, at *5.

The linchpin of XpertUniverse's fraudulent concealment claim is that the Governance Council's April 2006 vote to deny its SolutionsPlus application was final, and that the efforts by Hernandez and others at Cisco to secure its admission to the program in the months following the vote were a mere "sham" designed to prevent it from entering into a partnership with one of Cisco's competitors. Reply Br. of Plaintiff-Appellant at 4. The record, however, belies XpertUniverse's assertion that the Council's April 2006 vote was "final" and foreclosed any opportunity for it to be admitted as a SolutionsPlus partner. *See JMOL Decision*, 2013 WL 6118447, at *3 (explaining that the Council's April 2006 vote did not mean that XpertUniverse's SolutionsPlus application was "terminally denied"). Hernandez presented uncontroverted testimony that many products underwent "multiple

reviews" by the Governance Council.[7]  J.A. 1621.  He explained, moreover, that although the Council had expressed concern that XpertUniverse's platform was a "niche product," and that Cisco's sales force would have difficulty marketing it effectively, J.A. 10948, he had been confident that he and his team could "pull together the material to counter the [Council's] feedback" and eventually secure XpertUniverse's admission to the SolutionsPlus program, J.A. 1631.  Ross Daniels, a director of product marketing at the CCBU, likewise testified that he "did not view the decision at the April 19th Governance Council meeting [as] final."  J.A. 1326.  Even after the Council's vote, Daniels and others at the CCBU continued to work "through multiple tracks" to get XpertUniverse admitted to the SolutionsPlus program.  J.A. 1326; *see also* J.A. 5085.

Numerous Cisco emails and other documents confirm that Hernandez continued to push for XpertUniverse's admission to the SolutionsPlus program in the months following the Council's April 2006 vote.  *See* J.A. 5056–57, 5085–86, 11077, 11097, 11132, 11145.  Hernandez instructed Robert DePinto, the account manager on Cisco's CitiGroup team, J.A. 1627, to build a "business case" for admitting XpertUniverse to the SolutionsPlus program,

---

[7]    XpertUniverse argues that a flowchart it received from Cisco in January 2006 indicates that "if the Council rejects a candidate, nothing further happens."  Br. of Plaintiff-Appellant at 19 (citing J.A. 5233).  Notably, however, a later Cisco flowchart, dated April 2006, shows that a SolutionsPlus application may be resubmitted even if it is initially rejected by the Governance Council.  J.A. 11024.  More importantly, XpertUniverse failed to rebut Hernandez's unequivocal testimony that, in practice, many SolutionsPlus applications were reviewed "multiple" times by the Governance Council, J.A. 1621.

J.A. 5056; *see also* J.A. 5085, 11132, 11142, 11145.  In addition, in June 2006 Hernandez asked Eiss, XpertUniverse's president, for assistance in putting together a presentation to counter the Governance Council's concern that Cisco's sales staff would have difficulty selling XpertUniverse's product.  J.A. 11148–51; *see also* J.A. 11097, 11102–03.  Furthermore, in an effort to allay the Council's fear that XpertUniverse's platform was a niche product that would not generate significant revenue for Cisco, Hernandez worked to secure a "lighthouse account," or lead customer, for XpertUniverse's technology.  J.A. 1627, 1631, 11065.

In October 2006, Hernandez contacted Wiese, the most influential member of Cisco's Governance Council, J.A. 1657, and explained that XpertUniverse's technology could be used in important projects for CitiGroup and FedEx, two major Cisco clients, J.A. 1627.  Hernandez argued, moreover, that making XpertUniverse a SolutionsPlus partner would provide Cisco not only with significant short-term revenue opportunities, but "a long-term play for success."  J.A. 1640; *see also* J.A. 1639, 11100.  Shortly thereafter, Wiese emailed Hernandez, agreeing to support XpertUniverse's admission to the SolutionsPlus program.  J.A. 11100.  We reject, therefore, XpertUniverse's assertion that the Council's April 2006 vote was "final" and that the efforts, in the period between April and December 2006, to secure XpertUniverse's admission to the SolutionsPlus program were a mere "sham designed to 'stall' [XpertUniverse] from discovering the finality of the Council's decision," Reply Br. of Plaintiff-Appellant at 4.[8]  It was only in December

---

[8]  Even if Cisco deliberately delayed in informing XpertUniverse about the Governance Council's April 2006 vote, moreover, this would be insufficient, standing alone, to support a viable fraudulent concealment claim.  As

2006, after the proposed projects with CitiGroup and FedEx had fallen through, that Hernandez concluded that it was "the end of the opportunity" for XpertUniverse to be admitted to the SolutionsPlus program.  J.A. 1642.

Significantly, moreover, although XpertUniverse might not have been immediately informed of the Governance Council's April 2006 vote to "deny" its SolutionsPlus application, it knew that admission to the program was extremely competitive, J.A. 5129, and that the Council had considered, but not yet approved, its application, J.A. 1215–16.  Indeed, in the months after the Council's vote, XpertUniverse was aware not only that its SolutionsPlus application had not yet been approved, J.A. 1216, but that the Governance Council had voiced "valid concerns" about the ability of Cisco's sales staff to sell its product, J.A. 1215.[9]  XpertUniverse fails to show that any difference between what it knew (that its application had not yet been approved and that the Governance Council doubted whether Cisco's sales staff could effectively market XpertUniverse's product) and what it allegedly did not know (that the Council had made a non-final

---

discussed previously, XpertUniverse needed to show not only that Cisco intentionally concealed a material fact, but that any damages it incurred were caused by the concealment.  *See Graham*, 226 Cal. App. 4th at 609.

[9]    Although Eiss conceded that she knew that the Council had expressed "valid concerns" about the ability of Cisco's sales staff to sell XpertUniverse's product, she attempted to characterize these concerns as insignificant "training and education issues."  J.A. 1215.  To the contrary, however, because Cisco invests significant resources in managing and promoting a SolutionsPlus product, J.A. 1639, the issue of whether Cisco employees could effectively market XpertUniverse's technology was clearly a very important concern.

decision to "deny" its SolutionsPlus application) materially impacted its behavior. *See JMOL Decision*, 2013 WL 6118447, at *3. To the contrary, as the district court correctly determined, there was no credible evidence that XpertUniverse "would have withdrawn from [its] active relationship with Cisco" even if it had been immediately informed about the Council's April 2006 vote. *Id.*

## C. Damages

A second, and even more significant, defect in XpertUniverse's fraudulent concealment claim is that it failed to show that the nine-month delay in learning of the Council's vote caused it to go out of business and lose its purported $70 million in market value. *See Graham*, 226 Cal. App. 4th at 608 ("For fraudulent concealment, the plaintiff must plead and prove he or she sustained damage as a result of the concealment or suppression of fact."). Contrary to XpertUniverse's assertions, there was no credible evidence that it could have "preserv[ed]" its purported $70 million market value, Br. of Plaintiff-Appellant at 52, even if it had been immediately informed of the Council's vote.

To support its claim for lost-value damages, XpertUniverse relied upon the testimony of its expert, Bratic. According to Bratic, XpertUniverse was worth "at least $70 million" before the Council's April 2006 vote, but had lost all market value by January 2007 when it learned of the vote. J.A. 1450; *see also* J.A. 1462–64, 1467–68, 1473. Significantly, however, Bratic failed to make any valuation comparisons between XpertUniverse and other similar ventures. Instead, he based his valuation of XpertUniverse on the revenue projections furnished by XpertUniverse's own officers. J.A. 10996. These unsupported projections forecasted that XpertUniverse would experience revenue growth of more than 30,000% in the period between 2006 and 2010, notwithstanding the fact that it had not yet sold a product and had no contracts for

future sales, J.A. 1001, 11100–01. Given that Bratic's testimony was predicated upon the irrationally exuberant revenue projections furnished by XpertUniverse management, it provided an inadequate evidentiary foundation for the claim that XpertUniverse had a market value of $70 million in April 2006. *See Sargon Enter., Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747, 776 (2012) (rejecting expert testimony which assumed that the plaintiff's "market share would have increased spectacularly over time to levels far above anything it had ever reached"); *Piscitelli v. Friedenberg*, 87 Cal. App. 4th 953, 989 (2001) ("[D]amages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.").

Even more fundamentally, XpertUniverse failed to show that it suffered any diminution in market value as a result of the nine-month delay in learning of the Council's vote. XpertUniverse's lost-value damages claim hinges on its contention that if it had been informed of the Council's vote in April 2006, rather than January 2007, it could have preserved its market value by "monetiz[ing] a . . . partnership" with CitiGroup, IBM, or Genesys. Br. of Plaintiff-Appellant at 65. At trial, however, XpertUniverse failed to show that the nine-month delay in learning of the Council's vote caused it to forego any viable partnership opportunities. Although CitiGroup came close to beginning a joint pilot project with XpertUniverse and Cisco in May 2006, J.A. 1350, 5085–86, that project fell through due to internal financial problems at CitiGroup.[10] J.A. 1106, 1349–51, 11058. Given that CitiGroup lacked the resources to fund even a pilot project, J.A. 1106, there was insufficient evidence for a reasonable jury to conclude

---

[10] In the summer of 2006, CitiGroup underwent a major reorganization and was forced to lay off 17,000 employees. J.A. 1101.

that CitiGroup would have been willing—or able—to enter into any type of long-term partnership arrangement with XpertUniverse or to invest the resources necessary to enable it to sustain its purported $70 million market value.

Nor was there any credible evidence that XpertUniverse could have preserved its market value by partnering with Genesys or IBM. While XpertUniverse's technology allegedly had already been integrated with Genesys' router, J.A. 1086–87, no Genesys witness testified that it had any interest, in the spring of 2006, in entering into a partnership with XpertUniverse.[11] Likewise, although IBM "considered" paying XpertUniverse $20 million for a standstill agreement precluding XpertUniverse's sale for a year, J.A. 1105, 1094–95, it ultimately declined to make an offer, and no IBM witness testified that it would have been willing to enter into a partnership arrangement with XpertUniverse in the spring of 2006. There was, moreover, no showing that in April 2006 either Genesys or IBM would have had the ability, or the desire, to invest the resources necessary to allow XpertUniverse to effectively

---

[11] XpertUniverse attempts to bolster its contention that it could have entered into a successful partnership with Genesys by pointing to a May 2006 email from Sundara noting that there was a danger that Genesys might try to "buy[] out" XpertUniverse. J.A. 5086. This email, however, is insufficient to show that Genesys would have been willing to acquire, or partner with, XpertUniverse on terms that would have allowed it to retain its purported $70 million market value. *See JMOL Decision*, 2013 WL 6118447, at *5 ("Acquisition by Genesys is unsupported by anything more than a Cisco email noting a 'risk' of that acquisition; there is no evidence that [XpertUniverse] was ever up for sale or that Genesys had ever made a bid.").

market its product and preserve its market value. *See JMOL Decision*, 2013 WL 6118447, at *5 (emphasizing that there was no evidence that any potential partnership with Genesys or IBM would have "add[ed] value to [Xpert-Universe], in April 2006 or at any other relevant time").

More significantly, XpertUniverse fails to show that the nine-month delay in learning of the Governance Council's vote destroyed any potential partnership opportunities. Even assuming *arguendo* that Genesys or IBM would have been willing to enter into a partnership with XpertUniverse in April 2006, there was no credible evidence suggesting that they would not have been equally willing to do so in January 2007. We reject XpertUniverse's assertion that its ability to broker a partnership agreement with a company other than Cisco was "destroyed," Br. of Plaintiff-Appellant at 43, because it "exhausted its resources" trying to integrate its technology with Cisco's router in the period between April 2006 and January 2007, *id*. at 66. By April 2006, XpertUniverse was already in a precarious financial position, strapped for cash and considering employee layoffs. J.A. 1212; *see also* J.A. 11071–76. Despite operating for almost eight years, it had no sales and no contracts for future sales. J.A. 1106, 1200. Nor had it succeeded in producing a fully functional product. J.A. 1106, 1200. XpertUniverse points to no persuasive evidence showing that any additional resources it expended between April 2006 and January 2007 trying to integrate its product with Cisco's router materially impacted its ability to enter into a partnership with a company other than Cisco.

Equally unavailing is XpertUniverse's argument that the nine-month delay in learning of the Council's vote "caused [its] investors to flee," Br. of Plaintiff-Appellant at 66. Friedman testified that his company lost the backing of its investors because it was not admitted to the SolutionsPlus program. *See* J.A. 1199 ("[W]e were counting on SolutionsPlus to drive revenue . . . and [XpertUniverse]

was functioning . . . through investors that were backing what we were doing because this was going to happen. And so when it didn't happen . . . the investors . . . went away . . . ."). While being denied admission to the SolutionsPlus program may well have caused XpertUniverse to lose the backing of its investors, there was no evidence that the nine-month delay in learning of the Council's vote was responsible for any erosion in investor support. *See JMOL Decision*, 2013 WL 6118447, at *5 ("[I]f disclosure of Cisco's 'denial' in January 2007 destroyed [XpertUniverse], it is reasonable to wonder why disclosure of the 'denial' in April 2006 would not have had the same effect."). In short, there was insufficient evidence that learning of the Council's vote in January 2007, rather than April 2006, caused, or even hastened, XpertUniverse's financial demise.

D. Trade Secret Misappropriation and Breach of Contract

We likewise reject XpertUniverse's contention that the district court erred in granting summary judgment against it on its trade secret misappropriation and breach of contract claims. To support a claim for trade secret misappropriation under California law, "the information claimed to have been misappropriated [must] be clearly identified." *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 221 (2010). As the trial court correctly determined, XpertUniverse failed to identify forty-four of its forty-six purported trade secrets with adequate specificity. *See Summary Judgment Decision*, 2013 WL 867640, at *4; *see also Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167–68 (9th Cir. 1998).

As to trade secrets 18 and 33, the two secrets which the district court found had been adequately identified, XpertUniverse, despite extensive discovery, failed to produce any credible evidence that Cisco used either of these secrets in its products. *See Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1668 (2003) ("[T]o

prove misappropriation of a trade secret . . . a plaintiff must establish (among other things) that the defendant improperly 'used' the plaintiff's trade secret."); *see also Silvaco*, 184 Cal. App. 4th at 224 ("One clearly engages in the 'use' of a secret, in the ordinary sense, when one directly exploits it for his own advantage, e.g., by incorporating it into his own manufacturing technique or product."). At trial, Illah Nourbakhsh, XpertUniverse's expert, broadly asserted that XpertUniverse's trade secrets were "embodied" in various Cisco products, *Summary Judgment Decision*, 2013 WL 867640, at *4; *see also* J.A. 5622. He failed, however, to sufficiently identify any particular information that had been incorporated into any specific Cisco product. *See Summary Judgment Decision*, 2013 WL 867640, at *4.

On appeal, XpertUniverse asserts that it presented evidence sufficient to create a genuine issue of material fact as to whether Cisco misappropriated trade secrets 18 and 33, which include an "architecture diagram" of XpertUniverse's system "for connecting a customer to the best available expert in an organization without negatively affecting operations." Br. of Plaintiff-Appellant at 5. In support, XpertUniverse relies on color-coded flowcharts to compare its architecture diagram to Cisco's Expert Advisor and Remote Expert products. We decline to discuss these flowcharts in detail, as they have been marked confidential, but conclude that they are insufficient to show that Cisco misappropriated any XpertUniverse trade secret. The features depicted in the flowcharts are described in such general terms that they fail to show that Cisco misappropriated any specific technology or processes developed by XpertUniverse. *See Altavion, Inc. v. Konica Minolta Sys. Lab. Inc.*, 226 Cal. App. 4th 26, 43–44 (2014) ("The trade secret must be described with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit

the defendant to ascertain at least the boundaries within which the secret lies." (citations and internal quotation marks omitted)). Even assuming *arguendo* that the color-coded comparisons upon which XpertUniverse now relies were properly introduced at trial, they are insufficient to create any genuine issue of material fact as to whether Cisco improperly used information from trade secrets 18 and 33 when developing its Remote Expert and Expert Advisor products. *See* J.A. 5863–64, 5879.

We also reject XpertUniverse's argument that the district court erred in granting summary judgment on its claim that Cisco breached the parties' 2004 non-disclosure agreement. XpertUniverse's broad and wholly unsupported allegation that "content from numerous [XpertUniverse] documents marked Confidential" could be found "directly" in unspecified Cisco products, J.A. 6048, was insufficient to preclude summary judgment on its claim for breach of the parties' non-disclosure agreement. Contrary to XpertUniverse's assertions, there is no inconsistency between the district court's ruling that it raised a genuine issue of material fact on the question of whether Cisco used confidential information in a patent application and the court's determination that it failed to raise such an issue on the question of whether Cisco used such information in its products.[12] While Nourbakhsh identified specific XpertUniverse information that was allegedly

---

[12]  Although the trial court held that XpertUniverse presented evidence sufficient to raise a genuine issue of material fact on its claim that Cisco breached the parties' non-disclosure agreement by disclosing confidential information in a patent application, *Summary Judgment Decision*, 2013 WL 867640, at *6, the court subsequently ruled that XpertUniverse could not present this claim to the jury because there was no evidence of any damages resulting from the alleged breach, J.A. 1029–30.

disclosed in the patent application, his testimony failed to sufficiently identify any confidential information used by Cisco in its products. *See Summary Judgment Decision*, 2013 WL 867640, at *5–6.

## CONCLUSION

Accordingly, the judgment of the United States District Court for the District of Delaware is affirmed.

## **AFFIRMED**